

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-09-00445-CR

WILLIAM CHAD                                          APPELLANT
PROFFITT

V.

THE STATE OF TEXAS                                         STATE

------------

FROM THE 90TH DISTRICT COURT OF YOUNG COUNTY

------------

# MEMORANDUM OPINION[1] ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

------------

Appellant William Chad Proffitt filed a petition for discretionary review, arguing that this court should reconsider the sufficiency of the evidence to support his conviction in light of the Texas Court of Criminal Appeals' recent opinion in *Brooks v. State*, No. PD-0210-09, 2010 WL 3894613 (Tex. Crim. App.

---

[1]*See* Tex. R. App. P. 47.4.

Oct. 6, 2010), which was handed down after our original opinion in this case issued. Pursuant to rule of appellate procedure 50, we have reconsidered our previous opinion upon reviewing Proffitt's petition for discretionary review. *See* Tex. R. App. P. 50. We withdraw our September 16, 2010 opinion and judgment, and we substitute this opinion.

## I. INTRODUCTION

A jury found Appellant William Chad Proffitt guilty of manufacturing a controlled substance, namely methamphetamine, in an amount of four or more but less than two hundred grams. The trial court sentenced Proffitt to twenty-five years' confinement and a $5,000 fine. In two issues, Proffitt argues that the evidence is legally and factually insufficient to sustain his conviction. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Sergeants Jay Hutchins and Terry Vanlandingham of the Graham Police Department responded to a domestic disturbance call in an alley near Glease Street in Graham, Texas. When they arrived, they saw Trishell Rose and Proffitt arguing outside of a nearby house. The officers separated the two, and Sergeant Hutchins began questioning Rose while Sergeant Vanlandingham began questioning Proffitt. Rose was crying, had red marks on her face, and "looked as if she had been physically assaulted." She said that she had arrived home that day to find Proffitt cooking methamphetamine in her house and that they had

2

gotten into an argument about it. Rose lived in the house with her and Proffitt's daughter, and Proffitt lived a few blocks away.

Sergeant Hutchins then spoke to Proffitt. Sergeant Hutchins smelled "a very, very strong odor of ether" on Proffitt but did not smell ether on Rose. Sergeant Hutchins testified that ether is a common ingredient used to manufacture methamphetamine.

Rose gave Sergeant Hutchins permission to search her house. Sergeant Hutchins testified that the smell of ether in the house was also "very, very strong." Inside the house, the officers found a butter tub lying on the floor near a large amount of pink powder that was later revealed to be methamphetamine, a baby formula container filled with peeled lithium batteries, and a meth pipe. The officers also found coffee filters, Rooto drain opener, and salt—all common household items that are used in methamphetamine manufacturing—in Rose's kitchen.

Sergeant Hutchins contacted Sergeant Richard Ferguson, the evidence custodian for narcotics with the Graham Police Department. When Sergeant Ferguson arrived on the scene, he parked in the alley near a dumpster. He could smell a strong odor of ether when he got out of his car, and he searched the nearby dumpster. Inside the dumpster, he found a "punched starting fluid can" and a plastic Dr. Pepper bottle with a hose connected to it and made into an "HCL generator," items commonly used to make methamphetamine. The Dr.

Pepper bottle was "still gassing," which indicated to the officers that methamphetamine manufacturing had occurred recently.

The officers arrested Proffitt and took Rose to the police station for questioning. Sergeants Hutchins and Vanlandingham took Proffitt to an interview room, gave Proffitt the *Miranda* warnings,[2] and asked if Proffitt would write down what had happened. Proffitt wrote the following statement:

> [Rose] pulled up and caught me making dope (meth). Got mad, and me and her fought because she didn't know nothing about it.

The officers never attempted to obtain fingerprints from the items found in the dumpster because, according to Sergeant Hutchins, "all the evidence was leading to the defendant and the—the bottle was gassing and that's—to me that's very volatile for us." Sergeant Hutchins testified that the case was "pretty cut and dry" and that "[e]verything was corroborating that [Proffitt] was the one in fact processing methamphetamine."

At Proffitt's trial, Rose testified that she always left her house unlocked and was not surprised to find Proffitt there when she arrived home the day of his arrest. When she walked in, she smelled ether and found Proffitt in the kitchen "[m]essing with the meth stuff." She got mad at Proffitt for doing that in her home, and during their argument, she threw a bowl containing "bones," or the "leftover of cooking the meth," at Proffitt. At the police station, Rose wrote a

---

[2]*See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

4

statement similar to the above. Rose admitted at trial that she had been using methamphetamine "[o]ff and on" at that time.

Rose's neighbor Ada Brown testified that she saw Proffitt at Rose's house on a daily basis. Brown called the police on the day that Proffitt was arrested after she heard him and Rose arguing and saw Rose hitting Proffitt. Brown said that "[e]verybody in the neighborhood" knew that Rose's house was a "drug house" and that she saw a lot of traffic in and out of the house.

Sergeants Hutchins and Ferguson testified that they believed that the manufacturing process taking place inside Rose's house was the final step of the methamphetamine cooking process, the "powder-out stage." William L. Todsen, the chemist who analyzed the powder found in Rose's home, also testified that if no anhydrous ammonia or pseudophedrine tablets were found in the house, which was the case here, it would indicate that the methamphetamine was not manufactured all in one place.

Proffitt was the sole witness for the defense. He explained that he had gone to Rose's house to see their daughter and that he and Rose had begun fighting because she would not let him see their daughter. He said that, on the way to the jail, he had asked the officers whether Child Protective Services (CPS) would get involved and that one of the officers had replied that he "would have no choice but to call CPS" if both Proffitt and Rose went to jail. Proffitt testified that he had decided to say that he was manufacturing the

5

methamphetamine to do what was best for his daughter but that his statement was "[a]bsolutely not true."

### III. SUFFICIENCY OF THE EVIDENCE

In two issues, Proffitt argues that legally and factually insufficient evidence exists to show that he manufactured a controlled substance in violation of health and safety code section 481.112(d). Specifically, he contends that, although there is evidence that he was present where the methamphetamine was being manufactured, there was insufficient evidence linking him to the actual manufacture of the methamphetamine.

Because the Texas Court of Criminal Appeals recently held in *Brooks v. State* that there is no meaningful distinction between the *Clewis v. State*[3] factual sufficiency standard and the *Jackson v. Virginia*[4] legal sufficiency standard, we proceed to analyze Proffitt's arguments under the standard set forth in *Jackson*. *See Brooks*, 2010 WL 3894613, at *8.

### A. Standard of Review

In reviewing the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential

---

[3]922 S.W.2d 126 (Tex. Crim. App. 1996), *overruled by Brooks*, 2010 WL 3894613, at *8.

[4]443 U.S. 307, 99 S. Ct. 2781 (1979).

elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. at  319, 99 S. Ct. at 2789; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778.  The trier of fact is the sole judge of the weight and credibility of the evidence.  *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009).  Thus, when performing a sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder.  *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000).  Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict."  *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007).  We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution.  *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.  The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor.  *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

7

## B. Elements of Manufacture of
## a Controlled Substance and Links to Manufacturing

A person commits an offense if the person knowingly manufactures methamphetamine. Tex. Health & Safety Code Ann. §§ 481.102(6), 481.112(a) (Vernon 2010). The offense is a first degree felony if the aggregate weight of the methamphetamine is four or more but less than two hundred grams. *Id.* § 481.112(d).

The State can establish an offense by showing either that the defendant acted on his own to manufacture methamphetamine or that he, acting with intent to promote or assist with the commission of the offense, solicited, encouraged, or directed another to manufacture methamphetamine or aided or attempted to aid another in the manufacture. *See* Tex. Pen. Code Ann. §§ 7.01, 7.02 (Vernon 2003). To obtain a conviction for the manufacture of a controlled substance, the State must link the defendant either to an interest in the place where the manufacturing was taking place or to the actual act of manufacturing. *Webb v. State*, 275 S.W.3d 22, 27 (Tex. App.—San Antonio 2008, no pet.); *Isham v. State*, 258 S.W.3d 244, 248 (Tex. App.—Eastland 2008, pet. ref'd). This may occur through circumstantial evidence. *Webb*, 275 S.W.3d at 27. "Although mere presence at a drug laboratory is insufficient to support a conviction for manufacturing, it is a circumstance tending to prove guilt that, when combined with other facts, shows that the accused was a participant in the manufacturing." *Id.* The purpose of requiring the State to link the defendant to the manufacturing

is to protect the innocent bystander who merely inadvertently happens onto a methamphetamine lab. *Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005); *Gilmore v. State*, No. 02-06-00302-CR, 2008 WL 706621, at *2 (Tex. App.—Fort Worth Mar. 13, 2008, no pet.) (mem. op., not designated for publication).

### C. Sufficient Evidence

The evidence supporting the jury's verdict and linking Proffitt to the act of manufacturing methamphetamine includes Proffitt's written statement in which he admitted that he had manufactured the methamphetamine. As Proffitt points out, under the corpus delicti doctrine, an extrajudicial confession, standing alone, is insufficient to support a conviction without other evidence showing that a crime has been committed by someone. *Bible v. State*, 162 S.W.3d 234, 246 (Tex. Crim. App. 2005); *Salazar v. State*, 86 S.W.3d 640, 645 (Tex. Crim. App. 2002). Some evidence, independent of the accused's statement, must show that the crime actually occurred, although the independent evidence does not have to identify the accused as the culprit. *See Salazar*, 86 S.W.3d at 644–45.

Although Proffitt recanted his written confession at trial and explained that he had made the confession only after learning that police would call CPS if both he and Rose went to jail, the credibility of his testimony was an issue for the jury to determine. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778. Additionally, other evidence at trial independent of Proffitt's confession shows that the offense of manufacture of methamphetamine had

9

occurred.   The officers found several items related to methamphetamine manufacturing in and around Rose's house, including peeled lithium batteries, a "punched starting fluid can," a still-gassing homemade HCL generator, and powdered remains, or "bones," from methamphetamine manufacturing.

Even without Proffitt's written confession, sufficient evidence exists to link Proffitt to the recent manufacturing that had occurred at Rose's house.  Rose testified that she had arrived at her house that day to find Proffitt cooking methamphetamine there.  Sergeant Hutchins testified that when he arrived Rose was crying and looked as if she had been physically assaulted; Rose explained to the officers that she and Proffitt began arguing when she got home and found him cooking meth in her home.  Sergeant Ferguson testified that Proffitt had a "very, very strong odor of ether" about him and explained that if someone smells of ether, it "means [he has] been in close proximity to some open ether for a long period of time."  Sergeant Ferguson had never been around anyone who smelled of ether just from smoking or using methamphetamine.

Proffitt points out on appeal that Sergeant Vanlandingham's written report, which included Sergeant Hutchins's findings, did not include the fact that either officer had smelled ether on Proffitt.  Sergeant Hutchins testified that, despite this omission from the report, he had in fact told Sergeant Vanlandingham that Proffitt

10

smelled of ether.[5]  Sergeant Hutchins said that if he had written a report, he would have included that fact.  And even assuming a conflict in the evidence, we must presume that the jury resolved any conflicting inferences in favor of the prosecution and defer to that resolution.  *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.  Sergeant Hutchins further explained that Proffitt "was very adamant . . . that he had just gotten there and he was leaving, he was on his way to leave, and that everything that happened [had] happened outside the house, that he was not involved inside the house."  Sergeant Hutchins opined that, based on his experience, he thought Proffitt had made these statements because he did not want the officers to find the methamphetamine inside the house.  Although Proffitt did not live at Rose's house and no fingerprints or other direct evidence linked him to any of the evidentiary items found in or near Rose's house, the jury could have reasonably inferred from other evidence at trial that Proffitt did not innocently and inadvertently happen onto a methamphetamine lab, but was an active participant in the drug manufacturing process.  *See Webb*, 275 S.W.3d at 27.

Viewing the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Proffitt had committed the offense of manufacture of a controlled substance.  *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

---

[5]Sergeant Vanlandingham was not available to testify at trial.

Accordingly, we hold that the evidence is sufficient to support Proffitt's conviction.

We overrule Proffitt's two issues.

## IV. Conclusion

Having overruled Proffitt's two issues, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL:  LIVINGSTON, C.J.; WALKER and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  November 18, 2010